UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALFRED PIRRI, JR.,

                                    Plaintiff,

            -v-

LORI CHEEK, CHARLIE KICKHAM,
LOCKE RAPER, and CHEEK'D, INC.,

                                    Defendants.

19 Civ. 180 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Before the Court is defendants' motion for the imposition, as a sanction, of an award of partial attorneys' fees on plaintiff, following the uncontested entry of summary judgment in defendants' favor. For the following reasons, the Court grants defendants' motion.

I.   **Background**

The Court assumes familiarity with the facts and procedural history of this case. The Court details here the aspects of this litigation on which defendants' motion turns.

A.      **The Parties**

Plaintiff Alfred Pirri, Jr., brought this lawsuit against Lori Cheek, Locke Raper, Charlie Kickham, and Cheek'd, Inc. (together, the "Cheek'd Defendants"), and Joanne Richards. The Court dismissed Richards as a defendant on June 21, 2019, *see* Dkt. 46, and plaintiff never served Raper and Kickham. Accordingly, unless otherwise specified, the Court henceforth refers to Ms. Cheek and Cheek'd, Inc. together as "defendants."

### B.     Procedural History

#### 1.     From Pirri's Complaint to Defendants' Motion for Rule 11 Sanctions

Pirri, through counsel, brought claims related to U.S. Patent No. 8,543,465 (the "Patent")

against Cheek, Raper, Kickham, Cheek'd, Inc., and Richards, his former mental health therapist.

Pirri sought to be added as an inventor on the Patent, pursuant to 35 U.S.C. § 256.  His alleged

basis for seeking this relief was his claim that he had, years before Cheek, conceived of the idea

underlying the Patent—which involved a method of "online dating in reverse" in which a suitor

hands a card to a stranger, who may then access a website to assist him or her in contacting the

suitor—and had shared it with Richards, whom allegedly shared it with Cheek.  Pirri alleged that

it was not until watching a rerun of the television series Shark Tank, on which Cheek pitched

Pirri's idea as her own, that he discovered that Richards had betrayed his confidences.  Pirri also

brought (1) state-law claims against Richards, for breach of fiduciary duty and fraud and

(2) state-law claims against the Cheek'd defendants, for conversion and unjust enrichment.

While there is no basis for damages for co-inventorship, *see* 35 U.S.C. § 262, Pirri sought

$5 million in damages on the other claims.

This was Pirri's second lawsuit related to the Patent.  In 2017, in *Pirri v. Cheek*,

No. 17 Civ. 7089 (PAE), Pirri had sought a declaratory judgment of patent invalidity and

asserted the same four state-law causes of action as well as a claim of unfair competition.  The

Court dismissed Pirri's claims for lack of subject matter jurisdiction without prejudice to his

right to refile his state-law claims in state court or to file them in federal court provided that his

new complaint adequately pled federal jurisdiction.  *See* No. 17 Civ. 7089, Dkt. 64 at 11–12.

On January 7, 2019, Pirri filed the Complaint in this action.  Dkts. 1–2.  On April 3,

2019, at the initial pretrial conference, Pirri agreed to dismiss his claim against the Cheek'd

Defendants for breach of fiduciary duty of confidentiality and his claims against Richards for

2

unjust enrichment and correction of the inventorship of the Patent.  *See* Dkt. 32.  On April 15, 2019, Cheek, Cheek'd Inc., and Richards filed a joint motion to dismiss Pirri's remaining state-law claims.  Dkt. 34.  In response, on April 29, 2019, Pirri voluntarily dismissed his claims against all defendants for misappropriation of trade secrets, his claims against the Cheek'd Defendants for fraud, and his claims against Richards for conversion.  Dkt. 36.  He opposed the motion to dismiss on the remaining state-law claims.  *See* Dkt. 37.

On June 13, 2019, the Court granted the motion to dismiss in its entirety, finding that each of Pirri's remaining state-law claims were obviously time barred.  Dkt. 41 at 6 ("Pirri's claim of breach of fiduciary duty is clearly time-barred."); *id.* at 7 ("Pirri's fraud claim, too, is time-barred, regardless whether the six-year limitations period dating from the fraud or the two-year period dating from its discovery applies."); *id.* at 9 ("Pirri's conversion claim is also clearly untimely."); *id.* at 10 ("Pirri's unjust enrichment claim is time-barred . . . and duplicative of [his] untimely conversion claim.").  Following the Court's order on the motion to dismiss, only one of Pirri's six claims—his federal claim for joint inventorship—remained.

On June 23, 2019, defendants filed a motion for Rule 11 sanctions.  Dkts. 47–49. Defendants argued, in part, that Pirri's counsel had "violated [Federal Rule of Civil Procedure] 11(b)(2) by asserting state law claims which, after reasonable inquiry, a competent attorney could not have . . . reasonabl[y] belie[ved] . . . were well grounded in law" in light of the applicable statutes of limitations.  Dkt. 48 at 7.  The Court, finding that Pirri had not, at that point, clearly "abuse[d] judicial resources," declined to impose sanctions at that time.  Dkt. 51.

### 2.    Pirri's Motion to Amend His Complaint

One month after the Court's ruling on the motion to dismiss, Pirri moved to amend his Complaint.  As detailed in the Court's August 20, 2019 decision, Dkt. 62, Pirri proposed to add three new sets of claims.  First, he alleged that Cheek had stated in interviews that she attended a

dinner in February 2008 at which one of her work colleagues, John Doe, wrote a pick-up line on the back of a business card and handed it to a woman at a nearby table.  Dkt. 57-1 ("PAC") ¶ 67. Pirri claimed that John Doe left the dinner with a date and that Cheek left with a business idea. *Id.* ¶ 68.  He contended that these actions established that John Doe should be listed, with him, as a co-inventor of the Patent.  *Id.* ¶ 69.

Second, Pirri alleged that, by Cheek's own admission, the idea for the Patent was actually the product of her brainstorm sessions with approximately 20 different individuals.  *Id.* ¶¶ 73–74. Accordingly, Pirri claimed that Cheek committed fraud when she signed the inventor oath swearing that the information in her patent application was accurate.  *Id.* ¶¶ 80–90.

Third, Pirri claimed that in 2019, more than a decade after the events that formed the basis for his other claims, Cheek had defamed and slandered him.  In March 2019, Pirri alleged, Cheek posted an update to her social media account that expressed her desire for retribution against Pirri and solicited the public's help in obtaining it.  *Id.* ¶ 92.  Specifically, she wrote that she wanted to "out" Pirri—which he alleged was a reference to his homosexuality and an attempt to embarrass him.  *Id.* ¶¶ 93–94.  Pirri also alleged that Cheek started a GoFundMe campaign to help pay for this lawsuit and that the GoFundMe page contained a link to an article—written by a non-party to this litigation—entitled "Seemingly Crazy Man Alfred Pirri Jr[.] Claims Cheek'd Stole Dating App Idea Via Therapist."  *Id.* ¶¶ 96–99.  Pirri alleged that providing the link to this article constituted defamation because, he alleged, he does not suffer from mental health issues and "has never been a patient in a mental health facility."  *Id.* ¶¶ 100–03.  In addition, Pirri alleged that Cheek defamed him to persons including: (1) Congressman Jerrold Nadler, based on a tweet by a non-party that refers to a letter in which Cheek allegedly stated that Pirri thought of the dating app idea "while in a mental facility," *id.* ¶¶ 104–14; (2) an individual with the screen

name Steven Thrasher who responded to Cheek's GoFundMe Campaign with a comment in which Thrasher stated that he "get[s] angry when psychos sue Inventors and try to steal their ideas," *id.* ¶¶ 115–17; (3) Aaron Elstein, a reporter who allegedly emailed Pirri's counsel a message stating that "Cheek tells me that Pirri is scammer, grifter and troll (her words) who stole her idea for an online dating service after seeing her make a pitch for it on Shark Tank," *id.* ¶¶ 124–26; and (4) Jenny Block, a reporter who published an article that quotes Cheek as saying "this type of 'trolling with intent to steal' other people's startup ideas is an epidemic," *id.* ¶¶ 129–32.  Pirri alleged that "Cheek told many fallacious lies about Plaintiff Pirri to reporters, strangers, and even a member of Congress," "exhibited a reckless disregard for the truth," "intentionally sought to destroy Plaintiff Pirri in a scheme of retribution and public ridicule with defamatory lies," and "intentionally created, organized, and orchestrated vast public shame against Plaintiff Pirri based on defamatory lies," "includ[ing] false statements about Plaintiff Pirri being 'crazy' and in a mental health facility" and "false statements impugning Plaintiff Pirri's moral integrity in that he is a 'patent troll.'"  *Id.* ¶¶ 155–62.  Pirri alleged that he "is afraid that strangers may cause harm to him on account of Defendant Cheek's intentional harm to his reputation" and "has incurred humiliation and given that the internet is permanent, the damage is forever."  *Id.* ¶¶ 163–64.  Pirri sought $100,000 in damages for each count of defamation and slander.  *Id.* ¶¶ 154, 165.

In support of his motion to amend, Pirri argued that "Cheek either willfully made a wrong statement to the USPTO that is punishable by fine or imprisonment, or both, under 18 USC [§] 1001.  Alternatively, she lies today about the conception of the invention."  Dkt. 55 at 5.  He alleged a "Scheme For Retaliation [sic]," in which, in March 2019, "Cheek began a scheme to seek retribution against Plaintiff Pirri outside of the courtroom.  Unsatisfied with the justice that

this Court can provide, she sought to take mattes [sic] into her own hands" by "post[ing] on her social media page that she wanted to 'out this case, this man and his law firm to the world.'" *Id.* at 5–6. According to Pirri, Cheek asked her fans for "journalists, reporters, news contacts, etc. that might be interested in helping [her] expose these people." *Id.* at 6. Pirri further argued that "Defendant Cheek reaffirmed her vehement hatred for Plaintiff Pirri." *Id.* His basis for that assertion was "an article in Crain's Business of New York [sic], [in which Cheek was] quoted as saying 'I don't even know who I hate here' because Plaintiff Pirri has never appeared in court." *Id.* In sum, Pirri argued, "Cheek used her celebrity power and connections in an effort to destroy Plaintiff Pirri's reputation." *Id.*

Pirri further accused Cheek of "ben[ding] the truth to suit her twisted scheme," noting in particular "two major lies": the alleged letter to Congressman Nadler in which, Pirri claimed, Cheek had "stat[ed] that Plaintiff Pirri was a patient in a mental facility," and her "[d]efamation of [Pirri's] [m]oral [c]onduct," by characterizing his actions as "'trolling with intent to steal' other people's startup ideas." *Id.* at 6–7.

On August 20, 2019, the Court denied Pirri's motion to amend. Dkt. 62. As to Pirri's attempts to add John Doe and the other 20 unnamed individuals as co-inventors to the patent, the Court held that Pirri had not only failed to establish his standing to bring this claim, but had not even attempted to articulate a theory of standing. *Id.* at 5–6. The Court found that "Pirri's request to add claims of defamation and defamation *per se* against Cheek [were] just as easily dispatched," as "an amendment to add such claims would be futile, insofar as the Court lacks supplemental jurisdiction over them." *Id.* at 6. Noting that "the facts underlying the defamation claims and the inventorship claims rely on unrelated facts that occurred nearly a decade apart" and implicated distinct legal tests, the Court found that Pirri's defamation claims "clearly turn on

6

different events occurring at vastly different time periods" and "are not properly resolved in the same lawsuit." *Id.* at 7.

### 3.     From Discovery to Summary Judgment

Discovery relating to Pirri's sole surviving claim—joint inventorship of the patent—began in June 2019 and was slated to end on October 31, 2019. *See* Dkt. 50 (case management plan). On September 25, 2019, counsel to former defendant Richards filed a motion to quash a subpoena served by Pirri seeking a copy of Richards' employment records from the Pederson Krag Center, where she worked as a mental health counselor. *See* Dkts. 63–64. Richards had been dismissed as a defendant some three months earlier. *See* Dkt. 46. The Court stayed execution of the subpoena and called for an opposition by Pirri. Dkt. 65. Rather than respond on the merits, Pirri voluntarily withdrew the subpoena, *see* Dkt. 67, mooting the issue, *see* Dkt. 68.

On October 9, 2019, Pirri moved for an extension of time to complete discovery. Dkt. 69. He argued that an extension of two months beyond the October 31 deadline was necessary because, despite Richards' dismissal from the case, "she still remains central to the factual disputes of this case." *Id.* at 1. Pirri stated that he "intends to depose Ms. Richards, but it would be a fruitless endeavor without the fullest record possible," and that he needed time to serve a new subpoena on Richards' employer. *Id.* at 2. The Court denied Pirri's motion, stating that it "fail[ed] to see the relevance of Ms. Richards' personnel file . . . to the remaining federal patent claim in this dispute." Dkt. 70 at 2. The Court further noted that Richards' employer had previously produced documents in response to a subpoena from Pirri. *Id.*

On October 22, 2019, Pirri filed a "request for leave to voluntarily withdraw complaint without triggering attorney fees under 35 U.S.C. § 285." Dkt. 71. Pirri stated that he wanted to "voluntarily withdraw the remaining claim in this case with prejudice" in light of the fact that he had "recently filed another lawsuit against Defendant Cheek" in New York state court "based on

the proposed [amended] complaint" that Pirri had sought to introduce in this litigation.  *Id.* at 1.

Pirri stated that he "want[ed] streamline the litigation to solely prosecute the new state

complaint.  Plaintiff Pirri will never again sue Defendant Kickham, Defendant Raper, or Joanne

Richards for matters at issue here."  *Id.*  Before doing so, however, Pirri wanted this Court to

anticipatorily deny any motion for attorney fees or sanctions by defendants.  *Id.*

 In support of this request, Pirri stated that he "must withdraw this lawsuit because he

reasonably fears potential danger from complete strangers" because of a situation "created" by

Cheek.  *Id.* at 2.  He accused Cheek of "us[ing] her fame, contacts, and social media skills

against [Pirri]" to "r[u]n a vigilante retaliation campaign against Plaintiff Pirri for suing her."  *Id.*

Citing Cheek's alleged status as a "social media 'influencer,'" her purported contacts "with the

news media and even Congress," and her PR firm, which he alleged "specializes in social media

influence" and "boasts that [it] can eliminate the competition," Pirri alleged that Cheek had

"turned all of these as weapons to destroy [Pirri's] life."  *Id.*  He alleged that Cheek "solicited the

general public to avenge [Pirri] on her behalf," "targeted his homosexuality and sought public

assistance to 'out' him," "targeted his mental health" by "republish[ing]" and "retweet[ing] lies

about him," and "sent to the media edited versions of documents filed to this Court as part of her

campaign to smear Plaintiff Pirri."  *Id.*  As a result, Pirri contended, "[t]otal [s]trangers [a]re

[n]ow [a]ngry [a]t [Pirri]."  *Id.*  He stated that, "Plaintiff Pirri does not know who these people

are.  They are total strangers and Plaintiff Pirri cannot know their intentions, what they look like,

or whether they intend to act on their anger.  Plaintiff Pirri fears for his life, knowing that total

strangers are angry at him - because he sued Defendant Cheek."  *Id.*  Pirri further accused

Cheek's counsel of "[t]acitly [a]pprov[ing] [o]f [h]er [c]ampaign," by failing to "stop[] it" and

contended that defense counsel's prior Rule 11 motion was "unprofessional and disrespect[ed] this Court." *Id.* at 2–3.

Finally, in support of permitting dismissal with absolution against an award of fees, Pirri argued that "[d]iscovery is [i]ncomplete," because, while documents and interrogatories had been served and answered, neither party had taken a deposition, and thus terminating the case eight days before the scheduled end of fact discovery would "help conserve [judicial and] defense resources." *Id.* at 3. He also argued that "[g]enuine [i]ssues of [m]aterial [f]act [s]urround [t]his [c]ase," because "[i]f there were none, then [c]ounsel for [defendants] should have filed a summary judgment by now" but "has not." *Id.* In particular, Pirri pointed to "the disparity between the file history of . . . []the '465 patent[] and [defendants'] current story . . . [which] show[s] substantial negligence and perhaps an egregious pattern of fraud"—*i.e.*, the same claims regarding the purported joint inventorship of the various John and Jane Does which the Court had already rejected for lack of standing. *Id.* Pirri concluded by stating that he only sought to "[v]oluntarily [w]ithdraw[] [i]n [p]eace." *Id.*

The following day, defendants filed an opposition to Pirri's letter. Dkt. 72. Among other arguments, they noted that Pirri was seeking an advisory opinion from the Court, as he had not yet sought to withdraw his joint inventorship claim. *Id.* at 1. Defendants also pointed out that Pirri's admitted filing of a lawsuit in state court undercut his claim of fearing for his life, *id.* at 3, that—with discovery ongoing—it was premature for defendants to move for summary judgment, *id.*, and that—contrary to Pirri's claim that discovery was nascent—depositions had not occurred because Pirri had unilaterally postponed his own deposition until the penultimate day of discovery and had, without notice, "postponed and/or cancelled" his deposition of Cheek the same day that he filed his motion for an extension of discovery, *id.* at 2 & n.3.

The Court denied Pirri's request as premature.  Dkt. 73.

On October 29, 2019, Pirri moved to withdraw his claim of joint inventorship.  Dkt. 74.
In addition to rehashing arguments from his prior letter, Pirri argued that "[c]ollateral [e]stoppel"
should apply to any future motion for sanctions of attorneys' fees by defendants because the
Court had denied defendants' motion for sanctions—which Pirri characterized as "frivolous"—
following their successful motion to dismiss.  *Id.* at 2.  He also alleged that "Cheek has unclean
hands" based on the alleged facts raised in his state court complaint, *id.* at 3, and that Cheek's
"deplorable behavior is the sole reason why [Pirri] seeks to withdraw" his federal case, *id.* at 4.
Pirri also alleged that "Cheek's actions violate several criminal statutes," including "HARASSMENT
IN THE SECOND DEGREE under Penal Law § 240.26," that Cheek "acted intentionally with a
conscious objective and purpose to harass, annoy, and destroy [Pirri]," and noted that "sexual
orientation is a protected class under New York Hate Crimes statute."  *Id.* at 4–5.  Pirri then
alleged that defense counsel similarly has "unclean hands" by "[t]acitly [a]pprov[ing]" of
Cheek's "fraudulent social media campaign" which he "never stopped," by "[f]il[ing] a
[f]rivolous Rule 11 [m]otion," and by "[c]reat[ing] [f]ake [s]tories," including an "unrelated
fictional story of [Pirri]" in his opposition to Pirri's first motion to withdraw without penalty,
which Pirri characterized as "a slap in the face to Your Honor and this Court" and "a ruthless
attempt to divert your honor from all Defendant Cheek's deplorable actions which he purposely
ignored."  *Id.* at 5–6.

Pirri next reiterated his arguments about conserving judicial resources, incomplete
discovery, and the existence of disputed material facts, alleging that the "inventorship records of
the '465 patent show an egregious pattern of fraud."  *Id.* at 7.  Pirri asserted that his "decision to
withdraw this case is unrelated to [defendants'] document production" as he "only days ago first

viewed" the documents produced by defendants. *Id.* Having done so in the waning hours of fact discovery, however, he asserted that:

> The discovery of Defendant Cheek's deplorable actions cast a shadow of dishonesty and whether she can be trusted to litigate on fair terms. This implicates the authenticity of her document production. Defendant Cheek's documents show evidence of possible chronologically reordering them to present a different picture. It is clear that she tampered with documents filed before this Court to skew media bias and one wonders if she continues the same game. This fits her pattern which began with the filing of the fraudulent oath to the USPTO. She has made a mockery of both this Court and the USPTO. Her credibility is ruined and she will be made to account for her actions in the state action.

*Id.* at 8. Pirri did not, however, link these assertions to his desire to dismiss his patent claim in the instant litigation. Pirri concluded by asserting that "[t]he two parties have a lot more fighting to do [but] will do it in a single lawsuit, not two" and claiming that Cheek's actions had "ruined her credibility in this lawsuit," but that Pirri intended to "hold her accountable in state court." *Id.* at 9.

The Court called for a response from defendants. Dkt. 75. Defendants opposed Pirri's motion to withdraw. Dkt. 76. They noted that allowing Pirri to withdraw his claim at the close of discovery but before summary judgment would allow him to allege in state court—as he had already done in his new lawsuit—that this Court had not reached the merits of his joint inventorship claim and that, had he not chosen to withdraw his Complaint "on fear of his life," the evidence adduced would have validated his claims. *Id.* at 1–4, 7.

The Court, agreeing with defendants, denied Pirri's motion. Dkt. 79. The Court concluded that all five factors articulated by the Second Circuit in *Zagano v. Fordham University*, 900 F.2d 12 (2d Cir. 1990), counseled against allowing Pirri to voluntarily dismiss his federal claim at the close of discovery. *See id.* at 1 (citing *D'Alto v. Dahon Cal., Inc.*, 100 F.3d 281, 283 (2d Cir. 1996); *Zagano*, 900 F.2d at 14). In addition to the late stage of litigation, the Court noted that:

> Pirri's reasons for seeking at this late stage to dismiss his sole remaining claim here—a patent-inventorship claim under federal law—are far from adequate.  In essence, Mr. Pirri indicates that he would prefer to pursue state-law claims against defendants in a new suit that he has recently filed in state court.  These state-law claims, although formally distinct from the federal claim here, are substantially similar to it.  This is not a good reason to avoid litigating Mr. Pirri's federal claim to conclusion, ripe as it is for resolution on summary judgment.  Many of Mr. Pirri's other ostensible reasons for seeking to terminate this litigation—as stated in his motion, and an earlier letter to the court previewing his motion—such as a concern for judicial economy, are belied by his pursuit in state court of this new lawsuit.  Other proffered reasons border on frivolous.

*Id.* at 2 (internal citations omitted).  The Court also found that allowing Pirri to withdraw his claim two days before the conclusion of fact discovery:

> would enable vexatious conduct.  Having compelled defendants to expend time and money engaging in extensive motions practice and discovery, Mr. Pirri now seeks to withdraw immediately before the Court is asked to resolve defendants' anticipated motion for summary judgment on his remaining claim.  At the same time, Mr. Pirri proposes, in a new state court suit brought against many of the same defendants, to pursue claims derived from much the same facts and premised on the same factual thesis of ownership as the claim pending here.

*Id.* at 2–3.

On November 14, 2019, defendants, pursuant to the Court's individual rules, filed a letter requesting that the parties' upcoming case management conference serve as a pre-summary judgment motion conference.  Dkt. 78.  The Court granted this request, and directed Pirri to file a letter outlining the basis on which he would oppose or cross-move for summary judgment on the joint inventorship claim.  *See* Dkt. 79.  Pirri's letter indicated that he would oppose summary judgment on the basis of disputed material facts, which he argued were "exacerbated" because discovery was "truncated."  Dkt. 80 at 1–2.  He argued that "not a single deposition occurred . . . creat[ing] a vast sea of unresolved disputes of material fact."  *Id.* at 2.  Pirri then summarized what he styled as "Cheek Story 1.0 . . . 2.0 . . . [and] 3.0," in which he reargued the John and Jane Doe joint inventorship theory set out in the proposed amended complaint that the Court had months earlier declined to receive.  Pirri then argued that "Cheek's actions outside of this Court

12

indicate a woman caught in a lie" and asserted that "[t]rial is needed to determine the facts from fiction in Defendant Cheek's world." *Id.* at 2–3.  Finally, Pirri summarized his version of the events of his joint inventorship claim, as reflected in his Complaint, and argued that credibility determinations at trial would be decisive.  *Id.* at 3.

On December 16, 2019, the Court held the pre-motion conference.  *See* Dkt. 97 (transcript).  The Court began by asking Pirri's counsel if he would consider withdrawing his claim with prejudice, *id.* at 2–3, to which counsel was amenable.  After a colloquy with counsel for both parties, the Court clarified with Pirri's counsel that "[r]ather than litigating summary judgment you are asking me to, in effect, enter summary judgment for the defense on [the federal] claim," to which counsel responded "[t]hat was the motion we filed back on October 30." *Id.* at 3–4.  When the Court stated that "by agreeing to the entry of summary judgment for the defendant, you are acknowledging that the standard for summary judgment is met in the defendant's favor," however, Pirri's counsel responded that "[i]f that's your clarification, your Honor, I cannot agree to that for my client."  *Id.* at 6.

The Court then observed that "based on the letter previews, there is a lot of language and there is no proffer of any concrete evidence that would support [Pirri's] basis for claiming co-inventorship rights on this patent." *Id.* at 7.  The Court asked Pirri's counsel whether there was "some evidence that was adduced in discovery, meaning documents or testimony, that you have not referenced in your letter that would support your client's claim of co-inventorship on this patent?" *Id.* at 8.  Counsel responded that "discovery was cut short."[1]  Asked a second time

---

[1] The Court pointed out that "Discovery was not cut short.  Irrelevant discovery was precluded. You had all the time you needed, and I did not preclude any relevant discovery.  I precluded an attempt to use discovery in this federal case to take a whack at state claims that were previously dismissed.  That's just simply a falsehood." Dkt. 97 at 9.

whether "any evidence that was adduced in discovery" would support Pirri's federal claim, counsel responded "[n]othing else in discovery, your Honor, but we do want to bring in witnesses to corroborate Mr. Pirri's claim." *Id.* at 9.  Counsel explained that, while he could not recall their names, he believed that "two supervisory therapists" at the clinic where Richards worked had knowledge that would support Pirri's claims, although he had neither deposed them nor even attempted to contact them as of the date of the conference.  *Id.* at 9–11.

In light of Pirri's desire to contest summary judgment, the Court set a briefing schedule, while giving Pirri's counsel five days to file a letter indicating that his client "concedes that entry of summary judgment for the defense on the sole remaining claim [in] this case is proper." *Id.* at 15, 17.  On December 17, 2019, Pirri filed a letter "renew[ing] his motion to voluntarily withdraw the sole remaining patent claim with prejudice." Dkt. 85.  However, Pirri also stated that "[s]hould the Court deny this motion, [Pirri] asserts that he will oppose a motion for summary judgment." *Id.*  When defendants pointed out that this fell short of, and indeed was contrary to, conceding summary judgment, Dkt. 86, Pirri filed a second letter reiterating that he now sought to withdraw his claim with prejudice, which he asserted was "a crucial distinction," Dkt. 87.  In response, the Court issued an order stating yet again that Pirri's choice was to either concede summary judgment or oppose it if he had a good-faith basis to do so.  Dkt. 88.

On December 20, 2019, Pirri filed a third letter, this time indicating that he would not oppose summary judgment.  Dkt. 89.  The Court thereafter entered an order granting summary judgment to defendants and closed the case.  Dkt. 91.

### 4.    Defendants' Motion for Attorneys' Fees

On December 26, 2019, the Cheek defendants filed a motion for attorney fees, Dkt. 93, a supporting memorandum of law, Dkt. 94 ("Def. Mem."), the declaration of Lawrence B. Goodwin, Esq., with attached exhibits, Dkt. 95 ("First Goodwin Decl."), and the declaration of

Lori Cheek, Dkt. 96 ("First Cheek Decl.").  On January 6, 2020, Pirri filed a memorandum of

law in opposition, Dkt. 98 ("Pl. Opp'n"), the affidavit of Alfred Pirri, Jr., Dkt. 99 ("Pirri Aff."),

and the affidavit of Steven Fairchild, Esq., Dkt. 100 ("Fairchild Aff."), with attached exhibits.

On January 13, 2020, defendants filed a reply memorandum, Dkt. 101 ("Def. Reply Mem."), the

second declaration of Lawrence B. Goodwin, Esq., Dkt. 102 ("Goodwin Reply Decl."), with

attached exhibits, and the second declaration of Lori Cheek, Dkt. 103 ("Cheek Reply Decl."),

with an attached exhibit.  Finally, on January 15, 2020, Pirri filed a letter reporting that several

days prior, "Pirri was followed around an area Stop & Shop by a total stranger.  This stranger did

no shopping, and then followed Plaintiff Pirri to a ShopRite in a different shopping center in a

different city."  Dkt. 105.  Counsel attached a police report that Pirri filed following the incident.

While conceding that "we have no information on this stranger, his motives, or if he is connected

to this case in anyway [sic]," counsel reported that Pirri "believes that there is a connection," and

that the Court should therefore treat this incident as relevant to the motion for fees.  *Id.*

## II.      Discussion

The Court first discusses the standards applicable to defendants' motion for attorneys'

fees.  It then reviews the arguments made in support and opposition.  The Court then applies the

governing standards, finding an award of fees warranted.

### A.       Applicable Legal Standards

Defendants cite three sources of authority under which the Court may impose a sanction

of attorneys' fees.  The Court reviews them in turn.

Defendants first cite 35 U.S.C. § 285, which provides that, in a patent action, "[t]he court

in exceptional cases may award reasonable attorney fees to the prevailing party."  The Supreme

Court has held that an "exceptional case" under § 285,

is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.   District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).   Under this standard, "a district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees."   *Id.* at 555.   Some "nonexclusive . . . factors" that may guide this inquiry include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."   *Id.* at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)); *cf. Manhattan Review LLC v. Yun*, 765 F. App'x 574, 576 (2d Cir. 2019) (applying *Octane Fitness* to analyze a fee request "under the identically worded fee-shifting provision in the Lanham Act"); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 764 F. App'x 39, 41–42 (2d Cir. 2019) (same); *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 Civ. 224 (PAE), 2018 WL 3574864, at *9 (S.D.N.Y. July 25, 2018) (holding that the construction of "exceptional case" adopted in *Octane Fitness* governs the identical term as used in the Lanham Act), *aff'd*, 771 F. App'x 71 (2d Cir. 2019).   Ultimately, "[s]ection 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less . . . a high one."   *Octane Fitness*, 572 U.S. at 557

Under § 285, "a favorable judgment on the merits is not necessary for a defendant to be deemed a prevailing party for purposes of statutory fee-shifting."   *Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1303 (Fed. Cir. 2018); *cf. CRST Van Expedited, Inc. v. EEOC*, 136 S. Ct. 1642, 1646, 1651 (2016) (reaching the same holding as to a similarly worded provision of Title VII and noting that "Congress has included the term 'prevailing party' in various fee-shifting statutes,

and it has been the [Supreme] Court's approach to interpret the term in a consistent manner");
*see also Robinson v. O'Rourke*, 891 F.3d 976, 981–82 (Fed. Cir. 2018).  While a "defendant of
course, might prefer a judgment vindicating its position regarding the substantive merits of the
plaintiff's allegations," the Supreme Court has held that "[t]he defendant has . . . fulfilled its
primary objective whenever the plaintiff's challenge is rebuffed, irrespective of the precise
reason for the court's decision.  The defendant may prevail even if the court's final judgment
rejects the plaintiff's claim for a nonmerits reason."  *CRST Van Expedited, Inc.*, 136 S. Ct.
at 1651; *Raniere*, 887 F.3d at 1305; *cf. Manhattan Review LLC v. Yun*, 919 F.3d 149, 153
(2d Cir. 2019) (applying *CRST* to interpret "prevailing party" under the Lanham Act and
Copyright Act).  Such a policy fulfills the purpose of "deter[ring] the bringing of lawsuits
without foundation."  *CRST Van Expedited, Inc.*, 136 S. Ct. at 1652; *Raniere*, 887 F.3d at 1305.

Defendants next cite 28 U.S.C. § 1927, which provides that "[a]ny attorney . . . who so
multiplies the proceedings in any case unreasonably and vexatiously may be required by the
court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred
because of such conduct."  *Id.*  "To impose sanctions under § 1927, a court must find clear
evidence that (1) the offending party's claims were entirely without color, and (2) the claims
were brought in bad faith—that is, motivated by improper purposes such as harassment or
delay."  *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 55 (2d Cir. 2018) (internal
quotation marks, citations, and alterations omitted) (quoting *Kim v. Kimm*, 884 F.3d 98, 106
(2d Cir. 2018)), *cert. denied* 139 S. Ct. 1282 (2019); *see also Eisemann v. Greene*, 204 F.3d 393,
396 (2d Cir. 2000); *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999).
As to the first prong, "[a] claim is entirely without color when it lacks any legal or factual basis
. . . .  The question is whether a reasonable attorney could have concluded that facts supporting

17

the claim might be established, not whether such facts actually had been established." *Schlaifer Nance & Co.*, 194 F.3d at 337 (internal quotation marks and citations omitted).  As to the second prong, "[a] court may infer bad faith when a party undertakes frivolous actions that are completely without merit." *Huebner*, 897 F.3d at 55 (internal quotation marks omitted).

Finally, defendants invoke the Court's inherent equitable powers.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991).  As with § 1927, before a court can impose sanctions pursuant to its inherent powers, it must make a specific finding, supported by clear evidence, that the offending party's claims were without color and brought in bad faith.  *See Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 113–14 (2d Cir. 2009).  "Thus, in practice, 'the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.'"  *Schlaifer Nance & Co.*, 194 F.3d at 336 (ellipsis omitted) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)).

## B.    Analysis

### 1.    Defendants' Motion

Defendants seek to recover attorneys' fees from Pirri or his counsel under each of the above sources of authority.  Def. Mem. at 6–7.  They argue that Pirri was on notice from before the filing of this lawsuit—his second—that Richards and Cheek simply did not know each other. They note that this fact was supported by declarations under penalty of perjury submitted as early as January 2019, and that there has never been any evidence to the contrary.  This, they argue, fatally undercuts the premise of Pirri's joint inventorship claim.  *Id.* at 1–2.  Defendants further note that, by the close of discovery in October 2019, it was indisputably clear that no evidence whatsoever supported Pirri's claims.  Therefore, they argue, Pirri's efforts thereafter to

drop this lawsuit without conceding defeat—thereby clearing the way for him to pursue his state court defamation claims against Cheek—and the hyperbolic and fanciful arguments he advanced in support of those efforts, were vexatious, duplicitous, meritless, and brought in bad faith. *Id.* at 3–5. Significant here, while defendants depict Pirri's conduct throughout this litigation as sanctionable, they seek an award reflecting only those attorneys' fees expended beginning in October 2019. After that date, they argue, Pirri lacked any good faith basis to continue to pursue his claim, oppose summary judgment, and demand a trial. Def. Mem. at 8.

### 2. Pirri's Opposition

Strikingly, Pirri's opposition to defendants' motion is all but devoid of legal argument. Instead, he offers an extended, and at times more extreme, version of the accusatory screed he has trained on Cheek since seeking to amend his Complaint. Pl. Opp'n.

In sum, Pirri states that Cheek has taken "outrageous actions" which "[c]onstitute [c]yberbullying." *Id.* at 1–2. He accuses her of having "[s]ought [r]evenge" and "intended retaliation against" Pirri in a "campaign for revenge [that] was entirely motivated by her hate for" him, *id.* at 2, which "damaged [Pirri's] reputation and future livelihood," and caused "damage to [Pirri] beyond measure," *id.* at 4. He claims that Cheek "[e]ncouraged [p]ublic [r]etribution" and "public anger" against him, leaving him to "fear[] for his life and property because total strangers are angry at him on account of [Cheek's] words and actions" and "Pirri does not know who else [Cheek] encouraged to retaliate against him . . . giv[ing] rise to claims for both . . . intentional and negligent infliction of emotional distress." *Id.* at 6–7. Pirri further claims that "Cheek [t]argeted [h]is [h]omosexuality." *Id.* at 7. He argues that such actions "[v]iolate [s]everal New York [c]riminal [s]tatutes," including Harassment in the Second Degree,

Aggravated Harassment in the Second Degree—by "threatening 'strikes, shoves, kicks' or other 'physical contact'"[2]—and Hate Crimes. *Id.* at 8–9.

Pirri then argues that Cheek engaged in "reprehensible and sanctionable" litigation tactics for which he had "proposed an amended complaint for this Court to fully explore and consider [Cheek's] outrageous conduct." *Id.* at 9. He accuses Cheek of "[l]itigat[ing] in [b]ad [f]aith," and seeking "[o]ut-of-court revenge" that was "egregious and extreme." *Id.* at 10. He accuses Cheek of seeking to "[u]ndermine the [j]udicial [s]ystem" and his "right to a fair trial" by "attempt[ing] to influence potential jurors"[3] and "us[ing] her fame, power, and influence" to "undermine the [i]ndependent judiciary" by "obtain[ing] a direct audience with Congressman Nadler." *Id.* at 11–12. Pirri argues that Cheek's "[a]ctions are [s]anctionable under New York [l]aw," and that Cheek's "[i]ntentional torts" are "sanctionable with punitive damages." *Id.* at 12–15. Pirri again alleges that defense counsel filed a "[b]aseless" and "frivolous" Rule 11 motion "at the very same time that [Cheek was] conduct[ing] her retaliation campaign" and committing "intentional torts against [Pirri]." *Id.* at 15–16.

Pirri next argues that sanctions are inappropriate because "[t]here has been no discovery" into Cheek's alleged conduct, including her "revenge campaign" and "defamation." *Id.* at 16–17. Pirri argues that he "cannot properly defend against [the instant] motion without having had an opportunity to explore the damage that [Cheek] caused," and that the Court currently has "an incomplete record of [Cheek's] egregious revenge campaign." *Id.* at 17.

---

[2] Pirri's basis for alleging that Cheek made "threat[s] of physical violence" against him is her having "liked" several "angry, threatening comments [posted] on her website" by third parties.

[3] It is unclear what this accusation refers to. As Pirri himself concedes, his sole remaining claim for joint inventorship rights did not entitle him to a jury trial. Pl. Opp'n at 11–12.

Pirri next argues that—contrary to his concession of summary judgment on his one surviving federal claim, for a declaration of joint inventorship—he "had a reasonable basis to begin this lawsuit" because he is, in fact, the true inventor of the idea claimed in the Patent. *Id.* at 17–18. In support, however, Pirri provides nothing but tired arguments and speculation, including more accusations of lies and cover-ups, to support this claim. *Id.* at 18–20. Pirri does not cite to any admissible evidence to contradict his prior admission that no reasonable juror could find that he was entitled to relief on that claim.

Finally, Pirri argues that his conduct throughout this litigation has "respected judicial resources," including by voluntarily dismissing several claims after defendants filed their motion to dismiss and by seeking to withdraw his sole remaining claim without penalty just days before the conclusion of discovery. *Id.* at 20–21.

### 3.    Analysis

The Court finds that this is an "exceptional case[]" justifying the award of attorneys' fees to defendants under 35 U.S.C. § 285. As a threshold matter, defendants are clearly a prevailing party under the statute. They have "fulfilled [their] primary objective" of "rebuff[ing]" Pirri's joint inventorship claim. *See CRST Van Expedited, Inc.*, 136 S. Ct. at 1651; *Raniere*, 887 F.3d at 1305. They have secured the entry of summary judgment in their favor on plaintiff's sole remaining claim. What is more, they did so by ultimately securing a concession by Pirri that no reasonable juror could find that Pirri had come up with the idea for the Patent before Cheek did. Dkts. 89, 91. That they first wrought this concession from Pirri on the brink of summary judgment briefing, as opposed to earlier, is of no matter as to the "prevailing party" element. *See CRST Van Expedited, Inc.*, 136 S. Ct. at 1651; *Raniere*, 887 F.3d at 1305.

Turning to the litigation itself, and particularly Pirri's motions and filings reviewed here, the Court finds that this case is clearly "one that stands out from others with respect to the

substantive strength of [the two parties'] litigating position[s], []considering both the governing law and the facts of the case[.]"  *Octane Fitness*, 572 U.S. at 554.  Indeed, in the Court's more than eight-and-one-half years on the bench, Pirri's filings stand apart from those of other failed civil plaintiffs for the sheer lack of colorable factual (or legal) support; for their tendentious, bizarre, non-responsive and caustically accusatory arguments; and for their disregard for, and selective presentation of, evidence.

Consideration of the nonexclusive *Fogerty* factors confirms this assessment.  These include "frivolousness[,] . . . objective unreasonableness (both in the factual and legal components of the case)[,] and the need in particular circumstances to advance considerations of compensation and deterrence."  *Fogerty*, 510 U.S. at 534 n.19.

First, the Court finds that the arguments advanced by Pirri were often objectively unreasonable.  They were neither grounded in a rational understanding of the facts as supported by admissible evidence, nor a good faith reading of the law.  To take one example from the many contained in the Court's lengthy recitation of Pirri's arguments, *supra*, his repeated accusation—utterly irrelevant to this patent joint-inventorship litigation—that Cheek sought to "out" Pirri as a homosexual man grossly distorts Cheek's actual statement on social media defending herself against Pirri's lawsuits.  Cheek expressed there a desire "to 'out' this case, this man, and his law firm to the world."  *See* Dkt. 57-1 at 18.  Read in context, the plain meaning of Cheek's sentence is not exposing Pirri's sexual orientation, but to cast a spotlight on what Cheek described, in the next paragraph, as the conduct of a party and his law firm "trying to extort me (a second time around)."  *Id.*  Pirri, and his counsel, had had the full text of this statement available to them from the outset; indeed, Pirri's counsel included the complete social media post in his declaration in support of Pirri's motion to amend the Complaint to add a claim of defamation.  *See id.*  Yet

Pirri repeatedly, and scurrilously, sought to spin Cheek's statement on the basis of one word,
"out," to paint her as a homophobic bigot whose "actions" rise to the level of a hate crime.[4]

Many of Pirri's other arguments are quickly exposed as baseless or frivolous. *Fogerty*,
510 U.S. at 534 n.19. His claim to have been in fear of his life from Cheek, and that Cheek had
unleashed throngs of angry and violent people to exact revenge against Pirri on her behalf, are
based on comments made on social media by people other than Cheek. Pirri not only takes these
comments literally—itself unreasonable—but again pulls single words out of context and uses
them as a springboard to construct a delusional fantasy attributing vile retributive impulses to
Cheek.

In same vein are Pirri's claims that Cheek attempted to influence this Court and the
litigation in this case by slandering him to Congressman Nadler. Cheek's reply declaration in
support of her motion is explicit that she has "never physically seen [the Congressman], met with
him or spoken to him in my life. The letter [in question] was mailed to him and [I] hand
delivered the letter to his West Village office." Cheek Reply Decl. ¶ 8. Moreover, the allegedly
scarlet letter, attached to Cheek's declaration, not only does not defame him—it does not even
mention Pirri or this litigation. Cheek Reply Decl., Ex. 1. The letter is entirely benign as to
Pirri. It expresses how the current "patent system is harming inventors and entrepreneurs,
especially women and minorities," by allowing large companies to engage in the "efficient
infringement" of individual entrepreneurs' patented ideas. *Id.* Pirri's portrait of the letter as
supporting his claims in this litigation is frivolous.

---

[4] Notably, Pirri and his counsel have not articulated any basis for asserting that Cheek was even aware of Pirri's sexual orientation.

Pirri's repeated submission of arguments unmoored from law or facts was not harmless. It wasted the time of this Court, which was called upon to referee and adjudicate the resulting disputes. And it wasted the time and money of Cheek, whose counsel was obliged to oppose filing after filing, or risk potentially adverse consequences for failing to do so. Cheek is properly entitled to be made whole for the attorneys' fees spent on such oppositions. *Fogerty*, 510 U.S. at 534 n.19.

Finally, an award of attorneys' fees here serves the important purpose of "deter[ring] the bringing of lawsuits without foundation." *CRST Van Expedited, Inc.*, 136 S. Ct. at 1652; *Fogerty*, 510 U.S. at 534 n.19; *Raniere*, 887 F.3d at 1305. That is particularly important in this litigation, where Pirri has persisted in filing frivolous, unreasonable, and groundless claims, even when they were repeatedly rejected by this Court—up to and including his opposition to defendants' instant motion for fees.

The Court therefore grants an award of attorneys' fees to defendants pursuant to § 285. The Court finds such an award consistent with the statutory text, the Supreme Court's guidance in *Octane Fitness*, an application of the *Fogerty* factors, and this Court's discretion based on its intimate familiarity with the parties and the course of this litigation. Because the Court grants fees under § 285, it need not consider whether fees would also be justified under 28 U.S.C. § 1927 or its own inherent powers. The Court does note, however, that the record here would substantially support finding that a number of Pirri's claims both "lack[ed] any legal or factual basis," and were frivolous to the point that the Court could fairly infer bad faith. *See Schlaifer Nance & Co.*, 194 F.3d at 337; *Huebner*, 897 F.3d at 55.

It is the Court's considered judgment that this sanction is properly borne by Pirri's counsel. Counsel prepared, signed, and filed each submission at issue. In doing so, he

repeatedly certified that "to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions [were] warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; . . . the factual contentions [had] evidentiary support . . . and . . . the denials of factual contentions [were] warranted on the evidence." Fed. R. Civ. P. 11(b). The filings reviewed and quoted here cast grave doubt on whether this assertion was made by counsel in anything approaching good faith. To be clear, the Court does not here impose Rule 11 sanctions. But counsel's duties under Rule 11, which clearly were not attended to responsibly here, provide good reason for the fee award to be borne, in this case, by counsel.

Although the Court finds a basis in the record to impose costs dating back to Pirri's motion to amend his Complaint in July 2019, because defendants only seek to recover fees incurred beginning in October, the Court will limit its award to the period of October 1, 2019, to its entry of summary judgment on December 23, 2019. *See* Dkt. 91. Defense counsel's work during this period was completely unnecessary but for Pirri's unjustifiable maintenance of this action and concomitant litigation tactics. Defense counsel is directed to submit a declaration, attaching billing statements for these three months and quantifying the associated fees, by May 26, 2020. Pirri will then have one week to file an opposition, if any, limited exclusively to objections to the reasonableness of the fees incurred by defense counsel. If Pirri files an opposition, defendants' reply will be due one week later.

## CONCLUSION

For the reasons stated above, the Court grants defendants' motion for attorneys' fees and awards them those fees incurred between October 1, 2019, and December 23, 2019, pursuant to 35 U.S.C. § 285. The Court will issue an order specifying the amount of fees to be paid by

Pirri's counsel upon review of defendants' billing statements for these months.  The Clerk of

Court is respectfully directed to terminate the motion pending at docket 93.

     SO ORDERED.

                                        Paul A. Engelmayer
                                        United States District Judge

Dated:  May 18, 2020
        New York, New York